## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BARBARA MULLIN, JULIE JACKSON, PASTOR JOHN STEINBRUCK, and WILLIAM O'CONNOR, | : : : : | |
| Plaintiffs, | : : | |
| v. | : : | C.A. No. 11-580-LPS |
| SUSSEX COUNTY, DELAWARE, SUSSEX COUNTY COUNCIL, and MICHAEL H. VINCENT, in his official capacity as County Council President, | : : : : : | |
| Defendants. | : | |

David L. Finger, Esquire of FINGER & SLANINA, LLC, Wilmington, DE.
Ayesha N. Khan, Esquire, Alex J. Luchenitser, Esquire, and Brooke R. Hardy, Esquire of
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, DC.

       Attorneys for Plaintiffs.

Joseph S. Shannon, Esquire and Artemio C. Aranilla, II, Esquire of MARSHALL DENNEHEY
WARNER COLEMAN & GOGGIN, Wilmington, DE.

       Attorneys for Defendants.

## <u>MEMORANDUM OPINION</u>

May 15, 2012
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court are two motions: (1) a Motion to Dismiss (D.I. 7) filed by defendants Sussex County, Delaware (the "County"), Sussex County Council (the "Council"), and Michael H. Vincent, in his official capacity as County Council President (collectively, "Defendants"), and (2) a Motion for a Preliminary Injunction (D.I. 20) filed by plaintiffs Barbara Mullin, Julie Jackson, Pastor John Steinbruck, and William O'Connor (collectively, "Plaintiffs"). For the reasons set forth below, the Court will deny Defendants' Motion to Dismiss and grant Plaintiffs' Motion for a Preliminary Injunction.

## BACKGROUND

### I.    Factual Background

The Council holds weekly meetings that are open to the public. (D.I. 1 ¶ 14) Since at least 2006,[1] the Council has opened its meetings with a recitation of The Lord's Prayer,[2] led by the Council President. (*Id.* ¶¶ 16, 19) While reciting The Lord's Prayer, the Council President stands and faces the audience, and most members of the audience stand and bow their heads. (*Id.* ¶ 16; D.I. 22 at A33 ¶ 22, A38 ¶ 16, A50 ¶ 14)

The version of The Lord's Prayer delivered at the Council meetings is as follows:

---

[1]Although it is unclear exactly when the practice of opening Council meetings with a recitation of The Lord's Prayer began, audio recordings on the Sussex County website indicate that the practice dates to at least March 28, 2006. (D.I. 1 ¶ 19)

[2]While the parties are not consistent in their practice, the Court believes it is appropriate to capitalize the title "The Lord's Prayer." "The Lord" of the title, the parties agree, is Jesus Christ. *See* D.I. 41, Ex. A ¶¶ 15, 22 (wherein Defendant's expert, Dr. Crossan, agrees with Plaintiffs' expert that title is reference to Jesus Christ); *see generally* GORDON LOBERGER & KATE SHOUP, WEBSTERS NEW WORLD ENGLISH GRAMMAR HANDBOOK 241 (Wiley Publishers 2d ed. 2009) (stating words referring to a specific deity should be capitalized).

1

Our Father who art in heaven,
Hallowed be Thy Name;
Thy Kingdom come;
Thy will be done
On earth as it is in heaven.
Give us this day our daily bread;
And forgive us our trespasses
As we forgive those who trespass against us.
And lead us not into temptation,
but deliver us from evil.
For Thine is the Kingdom,
The power,
And the glory forever.
Amen.

(D.I. 1 ¶ 20)

Plaintiffs are Sussex County citizens who have attended Council meetings in the past and

plan to do so in the future. (*Id.* ¶¶ 7-10) Each of the Plaintiffs is offended by the Council's

recitation of The Lord's Prayer. (*See id.*) Two of the Plaintiffs, who are Christians, are offended

because they feel that the Council's practice co-opts and debases their faith. (*Id.* ¶¶ 8-9) The

other two Plaintiffs are non-Christian and are offended because they feel the Council's practice

demeans and excludes their beliefs. (*Id.* ¶¶ 7, 10)

## II.    **Procedural History**

Plaintiffs filed their complaint (the "Complaint") on June 30, 2011. (D.I. 1) The

Complaint alleges that the County's practice of having the Council President recite The Lord's

Prayer at the opening of Council meetings violates the Establishment Clause of the United States

Constitution, U.S. CONST. amend. I § 1, and the Delaware Constitution's corresponding

provision, DEL. CONST. art. I § 1. (*Id.*) In lieu of an answer, Defendants filed the pending

Motion to Dismiss on August 10, 2011. (D.I. 7) Defendants contend that Plaintiffs lack standing

2

to bring their claims and that the Complaint fails to state a claim upon which relief can be granted. (*Id.*)

On December 1, 2011, Plaintiffs filed a Motion for a Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65(a). (D.I. 20) The parties completed briefing on Plaintiffs' motion on January 4, 2012. (*See* D.I. 32) The Court held oral argument on both motions on January 11, 2012. (*See* Motions Hr'g Tr., Jan. 11, 2012 (D.I. 44) (hereinafter "Tr."))

At oral argument, the parties made a joint request that the Court treat the pending motions as cross-motions for summary judgment. (Tr. at 3, 6) Additionally, Defendants moved to strike one or both of the declarations of Plaintiffs' expert, David Harrington Watt. (*Id.* at 7-8) In the event that the Court did not strike Mr. Watt's declarations, Defendants also requested the opportunity to supplement the record in response to issues Mr. Watt raised in his second declaration. (*Id.* at 75) By Order dated January 12, 2012, the Court denied the parties' joint request to treat the pending motions as cross-motions for summary judgment, denied Defendants' request to strike, and permitted Defendants to supplement the record. (D.I. 36 ¶¶ 1-4) The Court also stayed discovery. (*Id.* ¶ 5; D.I. 38; D.I. 49) The parties' supplemental submissions relating to the pending motions were all filed by February 2, 2012. (*See* D.I. 41; D.I. 42; D.I. 43)

## LEGAL STANDARDS

### I. Motion to Dismiss for Lack of Standing

"A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter. Pursuant to Rule 12(b)(1), the Court must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007)

3

(internal citations omitted); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) (noting that standing is "threshold jurisdictional question"). A court may grant a motion to dismiss for lack of standing only if, after, "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

There are three requirements for Article III standing: (1) injury in fact, which means an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the challenged conduct, which means that the injury fairly can be traced to the challenged action of the defendant and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision, which means that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In addition to establishing Article III standing, a party must establish "prudential standing." *See Elk Grove Unified Sch. Dist. v. Newton*, 542 U.S. 1, 11-12 (2004); *Twp. of Lyndhurst v. Priceline.com Inc.*, 657 F.3d 148, 154 (3d Cir. 2011). Prudential standing embraces the following principles:

> (1) the plaintiff generally must assert his own legal rights and
> interests, and cannot rest his claim to relief on the legal rights or
> interests of third parties; (2) even when the plaintiff has alleged
> reasonable injury sufficient to meet the requirements of Article III,
> the federal courts will not adjudicate abstract questions of wide
> public significance which amount to generalized grievances
> pervasively shared and most appropriately addressed in the

4

> representative branches; and (3) the plaintiff's complaint must fall
> within the zone of interests to be protected or regulated by the
> statute or constitutional guarantee in question.

*Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 485 (3d Cir. 1998)

(internal quotation marks and citations omitted).

The party invoking federal jurisdiction has the burden to establish standing to sue. *See*

*Lujan*, 504 U.S. at 561. Each of the standing requirements "must be supported in the same way

as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and

degree of evidence required at the successive stages of the litigation." *Id.* "At the pleading stage,

general factual allegations of injury resulting from the defendant's conduct may suffice, for on a

motion to dismiss we presum[e] that general allegations embrace those specific facts that are

necessary to support the claim." *Id.* (internal quotation marks omitted). "When ruling on

motion to dismiss for lack of standing, federal courts may consider affidavits and other factual

materials in the record." *Nat'l Ass'n of State Utility Consumer Advocates v. F.C.C.*, 457 F.3d

1238, 1251 (11th Cir. 2006).

## II.    Motion to Dismiss for Failure to State a Claim

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires

the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372

F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat

Factory Secs. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted).

Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded

allegations in the complaint as true, and viewing them in the light most favorable to plaintiff,

5

plaintiff is not entitled to relief." *Maio*, 221 F.3d at 481-82 (internal quotation marks omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)). While heightened fact pleading is not required, "enough facts to state a claim to relief that is plausible on its face" must be alleged. *Twombly,* 127 S. Ct. at 1974. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted). Nor is the Court obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

## III.   **Motion for Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy that should be granted only if: (1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999).

6

## DISCUSSION

## I. **Standing**

As a threshold matter, Plaintiffs must establish that they have standing to challenge the

Council's legislative invocation practice. *See Marion v. TDI Inc.*, 591 F.3d 137, 147 (3d Cir.

2010) ("[S]tanding, because it implicates a federal court's authority to hear a case, must be

addressed as a threshold matter."). In order to establish standing, a Plaintiff must demonstrate

both Article III standing and prudential standing. *See Elk Grove Unified Sch. Dist.*, 542 U.S. at

11-12; *Twp. of Lyndhurst,* 657 F.3d at 154.

Plaintiffs have adequately alleged Article III standing.[3] First, Plaintiffs have adequately

alleged an injury in fact by alleging direct and unwelcome exposure to The Lord's Prayer. *See*

*Hinrichs v. Speaker of the House of Representatives of Ind. Gen. Assembly*, 506 F.3d 584, 590

n.5 (7th Cir. 2007) ("In the context of an alleged Establishment Clause violation . . . allegations

of direct and unwelcome exposure to a religious message are sufficient to show the injury-in-fact

necessary to support standing.") (internal quotation marks omitted); *see also Sch. Dist. of*

*Abington Twp. v. Schempp*, 374 U.S. 203, 224 n.9 (1963) (determining plaintiffs had standing to

challenge reading of Bible verses, including Lord's Prayer, because plaintiffs were "directly

affected by the laws and practices against which their complaints [were] directed"). Second,

---

[3]Defendants do not contest Article III standing. (Tr. at 44) Numerous federal courts have
held that a plaintiff has standing where, as here, the plaintiff attends a meeting of a legislative
body and witnesses an opening prayer. *See, e.g., Marsh v. Chambers*, 463 U.S. 783, 786 n.4
(1983) (holding that state legislator had standing to challenge legislature's practice of opening
sessions with prayer, both "as a member of the Legislature and as a taxpayer"); *Pelphrey v. Cobb
Cnty.*, 547 F.3d 1263, 1279 (11th Cir. 2008) (holding plaintiff "suffered a personal injury
sufficient to confer standing because [by attending commission meetings] he had direct contact
with" county commission's practice of opening meetings with prayers).

7

Plaintiffs have adequately alleged a causal connection between their injury – being "deeply offended" by the recitation of The Lord's Prayer – and the recitation of The Lord's Prayer at Council meetings; indeed, they claim that their injury is a direct result of hearing the recitation of The Lord's Prayer at Council meetings. (*See* D.I. 1 ¶¶ 7-10) Finally, Plaintiffs have alleged that the relief requested – an injunction, declaratory judgment, and nominal damages – will redress the injuries they have sustained. (*See id.* ¶¶ 42-44)

Plaintiffs have also adequately alleged prudential standing. First, Plaintiffs assert their own legal rights and interests. Second, Plaintiffs' injuries of being directly exposed to the Council's allegedly unconstitutional recitation of The Lord's Prayer are not generalized grievances that would be more appropriately addressed in the representative branches.[4] Finally, Plaintiffs' allegations that the Council violated the Establishment Clause by endorsing one religion – Christianity, and specifically Protestant Christianity – over all other religions is at least one of the exact interests protected by the Establishment Clause. *See Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *see also McCreary County v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (observing that "[t]he touchstone" of Establishment Clause

_____

[4]Defendants rely on two cases – *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464 (1982), and *Freedom From Religion Foundation v. Obama*, 641 F.3d 803 (7th Cir. 2011) ("*FFRF*") – to support their contention that Plaintiffs' mere allegations of being offended by the recitation of The Lord's Prayer are insufficient to confer prudential standing. (*See* D.I. 8 at 10) However, these cases are inapposite because, in both, the plaintiffs had no direct contact with the challenged conduct but, instead, merely heard of the conduct from others. *See Valley Forge*, 454 U.S. at 469, 486-87; *FFRF*, 641 F.3d at 812 (Williams, J., concurring). Conversely, here, the Complaint alleges that all of the Plaintiffs attended the Council meetings and directly heard and were exposed to the recitation of The Lord's Prayer. (*See* D.I. 1 ¶¶ 7-10)

8

"analysis is the principle that the First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion") (internal quotation marks omitted); *Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 603 (1989) ("Whatever else the Establishment Clause may mean[,] . . . it certainly means at the very least that the government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions).") (internal citation omitted).

Accordingly, the Court finds that Plaintiffs have standing to bring their claims.

## II. Establishment Clause Jurisprudence

Prior to reaching the merits of the parties' remaining motions, the Court will summarize the Establishment Clause jurisprudence that governs its analysis.

The Establishment Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting the establishment of religion." U.S. CONST. amend. I § 1. The instant case is specifically about legislative prayer, which has "unique footing in the landscape of First Amendment jurisprudence." *Pelphrey v. Cobb Cnty.*, 410 F. Supp. 2d 1324, 1329 (N.D. Ga. 2006). "[L]egislative prayer lies at the heart of two intersecting realities." *Joyner v. Forsyth Cnty.*, 653 F.3d 341, 345 (4th Cir. 2011). On one hand, legislative prayer "is deeply embedded in the history and tradition of this country" and "has coexisted with the principles of deestablishment and religious freedom." *Marsh v. Chambers*, 463 U.S. 783, 786 (1983). On the other hand, "not even the unique history of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with one specific faith or belief." *Allegheny*, 492 U.S. at 603 (internal citation and quotation marks omitted).

9

Thus, in this case, the Court must assess whether it is likely to conclude that the

Council's recitation of The Lord's Prayer is merely a constitutionally permissible way to

memorialize a public occasion, as Defendants contend (D.I. 27 at 5), or, rather, an

unconstitutional affiliation of the Government with one faith – Christianity – as Plaintiffs

contend (D.I. 32 at 2).

A.    **Supreme Court Precedent**

Although "[t]he Supreme Court's Establishment Clause jurisprudence is vast and

comprised of interlocking lines of cases applying the Clause in particular situations," *Doe v.*

*Indian River Sch. Dist.*, 653 F.3d 256, 269 (3d Cir. 2011), both parties agree that *Marsh v.*

*Chambers* – the only Supreme Court case to directly address the constitutionality of legislative

prayer – sets forth the proper standard for review of the recitation of The Lord's Prayer at

Council meetings.[5]   (*See* D.I. 21 at 20 n.7)

In *Marsh*, the Supreme Court evaluated an Establishment Clause challenge to the

Nebraska legislature's practice of beginning each legislative session with a prayer offered by a

publicly paid chaplain. *See* 463 U.S. at 784-85.  In order to assess the constitutionality of the

prayer practice, the Court engaged in an extensive historical analysis and determined that

legislative prayer had a "unique history" dating back to the First Congress. *See id.* at 786-90.

---

[5]Indeed, "the Supreme Court, in *Marsh*, excepted [the area of legislative prayer] from the
traditional analysis under the Establishment Clause." *Pelphrey*, 547 F.3d at 1269 (internal
citation omitted); *see also Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987) (noting that
*Marsh* did not apply *Lemon* test); *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1232 (10th Cir.
1998) (en banc) (in considering challenge to legislative prayer policy, determining that "the
mainline body of Establishment Clause case law provides little guidance for our decision in this
case[;] [o]ur decision, instead, depends on our interpretation of the holding in *Marsh*").

Based on the "unambiguous and unbroken history of" Congress permitting legislative

invocations for "more than 200 years," the Court ruled that the Nebraska Legislature's practice of

opening each session with a legislative prayer "[t]o invoke Divine guidance on a public body

entrusted with making the laws [was] not, in these circumstances, an 'establishment' of religion."

*Id.* at 792.

In addition to discussing legislative prayer in general, the Supreme Court addressed

whether any particular features of the Nebraska invocation practice violated the Establishment

Clause. *See id.* Specifically, the Court identified three potentially problematic aspects of the

Nebraska prayer practice: (1) the prayers were given by "a clergyman of only one denomination –

Presbyterian – [who] has been selected [by the Nebraska legislature] for 16 years;" (2) "the

chaplain is paid at public expense;" and (3) "the prayers are in the Judeo-Christian tradition." *Id.*

at 793.

The Court concluded that none of these features rendered the Nebraska prayer practice

unconstitutional. First, the Court noted that even though the prayers were usually given by a

Presbyterian minister, there was no evidence that the minister was appointed to deliver the

prayers out of some impermissible motive or desire to advance one specific faith. *Id.* at 793-94.

Nor did the Court find it constitutionally problematic that the minister was paid out of public

funds, as "remuneration [was] grounded in historic practice." *Id.* at 794. Finally, the Court

rejected arguments that the prayers were unconstitutional because they were in "the Judeo-

Christian tradition," as the prayers were "nonsectarian" and, in response to earlier complaints, the

11

chaplain had "removed all references to Christ" from the prayers. *Id.* at 793 n.14.[6]

Six years after *Marsh*, the Supreme Court offered further guidance. In *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, a religious display case, the Court explained that *Marsh* "recognized that not even the unique history of legislative prayer can justify the contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief." 492 U.S. at 603 (internal quotation marks and citation omitted). The Court stated that "[t]he legislative prayers involved in *Marsh* did not" have the effect of affiliating the government with any one specific faith "*because* the particular chaplain had removed all references to Christ." *Id.* (emphasis added). The Court stressed that while *Marsh* found that "history may affect the constitutionality of *nonsectarian* references to religion by the government, history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed." *Id.* (emphasis added).

## B.    Circuit Court Guidance

Numerous circuit courts have addressed the constitutionality of specific legislative prayer practices in light of *Marsh*.[7]  The Seventh Circuit has stated that it "read[s] *Marsh* as hinging on the nonsectarian nature of the invocations at issue." *Hinrichs v. Bosma*, 440 F.3d 393, 399 (7th

---

[6]In a 2005 religious display case, the Supreme Court reiterated the importance to its holding in *Marsh* of the fact that the chaplain had removed all references to Christ. *See Van Orden v. Perry*, 545 U.S. 677, 688 n.8 (2005).

[7]The Third Circuit has yet to address the issue of the constitutionality of legislative prayers under *Marsh*. The only Third Circuit case to cite *Marsh* in a prayer-related context involved the constitutionality of delivering a prayer at the opening of a school board meeting. *See Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 259 (3d Cir. 2011). There the Court applied the more restrictive Establishment Clause test of *Lemon v. Kurtzman*, 411 U.S. 192 (1973), due to the presence of students at the meetings. *See id.* at 275.

12

Cir. 2006), *superseded on standing grounds sub nom. Hinrichs v. Speaker of House of Reps of Ind. Gen. Assembly*, 506 F.3d 584, 600 (7th Cir. 2007). The Tenth Circuit, in an opinion denying a speaker's request to present an invocation at a city council meeting due to the invocation's disparaging, proselytizing content, stated that a permissible prayer under *Marsh* "typically involves nonsectarian requests for wisdom and solemnity, as well as calls for divine blessing on the work of the legislative body." *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1234 (10th Cir. 1998) (en banc) (stating that *Marsh* approved of "genre" of prayer that "is a kind of ecumenical activity that seeks to bind peoples of varying faiths together in a common purpose").

Circuit courts have further held that recitation of sectarian prayers associated with one faith improperly advance a specific faith in violation of *Marsh*. The Ninth Circuit has held that, presuming *Marsh* was applicable, a school board's practice of reciting invocations (which ended "in the Name of Jesus") violated the Establishment Clause because these invocations were an unconstitutional effort to "advance[ ] one faith, Christianity, providing it with a special endorsed and privileged status in the school board." *Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ.*, 52 Fed. Appx. 355, 357 (9th Cir. Dec. 3, 2002).[8] The Sixth Circuit has held that delivery of sectarian invocations and benedictions at a high school graduation did "not pass the *Marsh* test" because such sectarian invocations "say[ ] to some parents and students: we do not recognize your religious beliefs, our beliefs are superior to yours[,]" and also "symbolically place the

---

[8]A California state Court, interpreting *Marsh*, held that a chaplain opening city council meetings with an invocation that invoked the name of Jesus Christ violated the Establishment Clause because "it conveyed the message that Christianity was being advanced over other religions." *Rubin v. City of Burbank*, 124 Cal. Rptr. 2d 867, 873 (Cal. Ct. App. 2002) ("[W]e interpret Marsh to mean that *any* legislative prayer that proselytizes or advances one religious belief or faith . . . violates the Establishment Clause.") (emphasis in original).

13

government's seal of approval on one religious view." *Stein v. Plainwell Cmty. Schs.*, 822 F.2d 1406, 1410 (6th Cir. 1987).[9] The Fifth Circuit has concluded that there is advancement of religion in violation of the Establishment Clause when a board permits speakers to offer uniformly Christian prayers with overtly sectarian references and refuses to adopt a nonsectarian prayer policy. *See Doe v. Tangipahoa Parish Sch. Bd.*, 473 F.3d 188, 203 n.2 (5th Cir. 2006), *vacated on standing grounds*, 494 F.3d 494 (5th Cir. 2007) (en banc).

In a series of cases, the Fourth Circuit has held that the delivery of solely sectarian invocations associated with one faith violates the Establishment Clause, whereas nonsectarian invocations are constitutionally permissible. *Compare Wynne v. Town of Great Falls*, 376 F.3d 292, 301-02 (4th Cir. 2004) (holding that town council's practice of opening meetings with sectarian prayers that included reference to Jesus Christ was unconstitutional because it impermissibly advanced Christianity), *with Simpson v. Chesterfield Bd. of Supervisors*, 404 F.3d 276, 278, 284 (4th Cir. 2005) (holding town board of supervisors' practice of inviting community religious leaders to deliver "non-sectarian [invocations] with elements of the American civil religion" at opening of board meetings was constitutionally permissible), *and Turner v. City Council of Fredericksburg*, 534 F.3d 352, 356 (4th Cir. 2008) (O'Connor, J.) (holding town council's decision to allow "only nonsectarian legislative prayers place[d] [the council's decision] squarely within the range of conduct permitted by *Marsh* and *Simpson*[,]" as "[t]he

---

[9]The Sixth Circuit's holding that *Marsh* applied to invocations given at a high school commencement was subsequently overturned by the Supreme Court. *See Lee v. Weisman*, 505 U.S. 577, 596 (1992) (holding that "[i]nherent differences between the public school system and a session of a state legislature distinguish this case from *Marsh*"). However, the Sixth Circuit's discussion of *Marsh* and its prohibition on sectarian prayers "remains valuable." *Hinrichs*, 440 F.3d at 400 n.3.

14

restriction that prayers be nonsectarian in nature is designed to make the prayers accessible to people who come from a variety of backgrounds, not to exclude or disparage a particular faith").

In a 2011 case, *Joyner v. Forsyth County*, the Fourth Circuit held that the Forsyth County Board of Commissioners' policy of inviting religious leaders of various faiths to offer invocations was unconstitutional in practice because numerous religious leaders gave explicitly sectarian invocations that repeatedly invoked specific tenets of Christianity. *See* 653 F.3d at 344, 353-54. The Fourth Circuit explained:

> [Supreme Court and Fourth Circuit precedent] establish that in order to survive constitutional scrutiny, invocations must consist of the type of nonsectarian prayers that solemnize the legislative task and seek to unite rather than divide. Sectarian prayers must not serve as the gateway to citizen participation in the affairs of local government. To have them do so runs afoul of the promise of public neutrality among faiths that resides at the heart of the First Amendment's religion clauses.

*Id.* at 342-43.

The Eleventh Circuit has rejected an argument that *Marsh* permits only nonsectarian prayers; instead, it views *Marsh* as mandating examination of multiple factors to assess whether a legislative prayer opportunity has been exploited to advance one faith.[10] *See Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1271 (11th Cir. 2008). In *Pelphrey*, the Eleventh Circuit held that the practice of two county commissions that allowed volunteer leaders of different religions, on a rotating basis, to offer invocations with a variety of religious expressions did not violate the Establishment Clause. *See id.* at 1266-67. In reaching this conclusion, the Court emphasized the

---

[10]These factors include the speaker's religious affiliations and tenure delivering the invocations as well as the overall nature of the prayers. *See Pelphrey*, 547 F.3d at 1271. The Eleventh Circuit noted that, in *Marsh*, the "'non-sectarian' nature of the chaplain's prayers was [but] one factor in this fact-intensive analysis; it did not form the basis for a bright-line rule." *Id.*

invocations contained a "diversity of . . . religious expressions,"[11] which "support[ed] the finding

that the prayers, taken as a whole, did not advance any particular faith." *Id.* at 1278. Although

the Court did not "embark on a sensitive evaluation or . . . parse the content of a particular

prayer," it reached its decision only after "finding[ ] that the prayers of the County Commission

were not exploited to advance one faith or belief." *Id.*

### III.    Motion to Dismiss

The Court concludes that Plaintiffs' Complaint adequately states claims under both the

United States Constitution and the Delaware Constitution.

### A.    United States Constitution

The Complaint states a claim for violation of the Establishment Clause of the First

Amendment of the United States Constitution. Defendants contend that Plaintiffs' claims are

barred by the Supreme Court's holding in *Marsh*; however, the Complaint contains numerous

allegations that make this case factually distinguishable from *Marsh*. Specifically, the Complaint

alleges that the Council opens each session by having the Council President recite The Lord's

Prayer, which the Complaint alleges is "a distinctly Christian prayer" and, in particular, the

"version typically delivered by Protestants." (D.I. 1 ¶¶ 1, 21-22) The Complaint further alleges

that "[b]y persistently sponsoring this Christian prayer, the County Council has aligned itself

with a single faith" and, therefore, the Council's prayer practice "has the purpose and effect of

---

[11]The prayers were offered by Christian, Jewish, Unitarian, and Muslim speakers, which the Court noted represented "a wide cross-section of the County's religious leaders." *Pelphrey*, 547 F.3d at 1277. The prayers also contained references to a variety of religious figures, including Jesus Christ, Allah, Mohammed. *See id.* at 1278. Additionally, some prayers referenced the Torah, and the prayers contained references to a variety of terms, including "king of kings and lord of lords, Heavenly Father, and God of Abraham, Isaac, and Jacob, God of history, Lord of creation, Lord of love, our Father." *Id.* (internal quotation marks omitted).

promoting, advancing, favoring, and endorsing the Christian religion." (*Id.* ¶¶ 2, 33) These allegations are sufficient to state a claim for violation of the Establishment Clause of the United States Constitution because, unlike the prayer in *Marsh* – which did not advance a specific faith – the Council's prayer practice is alleged to advance the Christian faith and, thereby, constitute government endorsement of Christianity. As discussed above, numerous federal courts, relying on *Marsh*, have held that delivery of sectarian prayers at legislative meetings is unconstitutional because these prayers affiliate the government with a specific faith.[12]

## B. Delaware Constitution

Additionally, Plaintiffs have stated a claim under the Delaware Constitution. Article I, Section 1 of the Delaware Constitution provides that "no power shall or ought to be vested in or assumed by any magistrate that shall in any case interfere with, or in any manner control the rights of conscience, in the free exercise of religious worship, nor a preference given by law to any religious societies, denominations or modes of worship." DEL. CONST. art. I § 1. Plaintiffs have adequately alleged that the Defendants' practice of opening each Council meeting with a prayer violates the Delaware Constitution because this practice gives preference "to religious societies and modes of worship that use [T]he Lord's Prayer generally, and the Protestant version of [T]he Lord's Prayer in particular." (D.I. 1 ¶ 37)

The Delaware Constitution provides protections that are, at a minimum, co-extensive with the protections provided by the United State Constitution. *See generally Doe v. Cape*

---

[12] *See, e.g., Joyner*, 653 F.3d at 349-50; *Tangipahoa Parish Sch. Bd.*, 473 F.3d at 202-03; *Wynne*, 376 F.3d at 301-02; *Bacus*, 52 Fed. Appx at 356-57; *see also Hinrichs*, 440 F.3d at 394-96 (determining plaintiffs were likely to succeed on merits of constitutional challenge to legislature's practice of opening its meetings with "overtly sectarian prayer, usually Christian").

17

*Henlopen Sch. Dist.*, 759 F. Supp. 2d 522, 528 (D. Del. 2011) (stating Article I, Section 1 of Delaware Constitution "is analogous to the Establishment Clause and Free Exercise Clause of the First Amendment of the United States Constitution"). Thus, because Plaintiffs have sufficiently pled claims to withstand dismissal under the United State Constitution, Plaintiffs claims also withstand dismissal under the Delaware Constitution.

Accordingly, Defendants' Motion to Dismiss will be denied.

## IV. Motion for Preliminary Injunction

Plaintiffs have demonstrated that a preliminary injunction is warranted in this case because all four factors favor granting a preliminary injunction.

### A. Likelihood of Success on the Merits[13]

Plaintiffs have demonstrated a likelihood of success on the merits of their claim that the Council's practice of opening meetings with a recitation of The Lord's Prayer is unconstitutional.

Plaintiffs have shown a likelihood that the Court will deem the version of The Lord's Prayer delivered at the Council meetings to be a distinctly Christian prayer and, thus, a sectarian prayer.[14] Numerous courts have concluded that The Lord's Prayer is a Christian, sectarian

---

[13]The analysis contained here with respect to likelihood of success on the merits is necessarily preliminary. While the Court finds a likelihood that Plaintiffs will succeed on the merits of their claims, a likelihood is not a guarantee. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 393-94 (1981) (opining that district court's findings on "likelihood of success on merits" are not "tantamount to decisions on the underlying merits," adding the two are "significantly different").

[14]Defendants assert that the Court should not engage in an analysis of whether The Lord's Prayer is sectarian. *See* D.I. 8 at 14; D.I. 27 at 7, 9; *see also Marsh*, 463 U.S. at 794-95 ("The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief."). However, the Court concludes that such an analysis is necessary in order to assess the constitutionality of Council's recitation of The Lord's Prayer. *See generally Indian*

18

prayer. *See, e.g., Doe ex rel. Doe v. Sch. Dist. of Norfolk*, 340 F.3d 605, 607 (8th Cir. 2003)

(referring to The Lord's Prayer as "a Christian prayer"); *Chaudhuri v. Tennessee*, 886 F. Supp.

1374, 1380 (M.D. Tenn. 1995) (referring to The Lord's Prayer as "a well-known Christian

prayer"); *Warner v. Orange Cnty. Dep't of Probation*, 870 F. Supp. 69, 71 (S.D.N.Y. 1994)

(calling The Lord's Prayer "a specifically Christian prayer"); *Griffin v. Coughlin*, 673 N.E.2d 98,

107 (N.Y. 1996) ("[T]he Lord's Prayer . . . is a specifically Christian prayer."); *see also Sch.*

*Dist. of Abington*, 374 U.S. at 267, 284 n.61 (Brennan, J., concurring) (referring to The Lord's

Prayer as "an essentially Christian supplication" and stating that recitation of The Lord's Prayer

is "clearly sectarian"); *Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1037 n.2 (7th Cir. 1995)

("The Lord's Prayer, a prayer taught by Jesus to the Disciples, appears in the Christian Bible at

two places: a longer version contained in the Sermon on the Mount at *Matthew* 6:9-13, and a

shorter version at *Luke* 11:2-4."); *United States ex rel. Phillips v. Downer*, 135 F.2d 521, 523 (2d

Cir. 1943) (referring to The Lord's Prayer as a "teaching[ ] of the Christian church"); *Skarin v.*

---

*River Sch. Dist.*, 653 F.3d at 265-67 (examining content of prayers given at board meetings to
determine if such prayers were exclusively Christian); *see also generally* D.I. 32 at 5-6
(collecting cases where courts have examined content of prayers in order to assess
constitutionality under Establishment Clause). Even the Eleventh Circuit in *Pelphrey*, a case on
which Defendants rely, examined the content of the prayers at issue. *See* 547 F.3d at 1277-78
(stating prayers at issue "contained references from Christianity and other faiths" and noting
"[s]ome prayers included references to 'Jesus Christ,' but others referenced 'Allah,'
'Mohammed,' and the Torah"). Indeed, in *Marsh*, the Supreme Court analyzed the content of the
prayers, at least to the extent of determining the prayers were nonsectarian. *See* 463 U.S. at 793
& n.14; *see also generally Joyner*, 653 F.3d at 351 (rejecting idea that courts cannot examine
content of prayers and stating: "It is to say the least an odd view of the judicial function that
denies courts the right to review the practice at issue. For to exercise no review at all – to shut
our eyes to patterns of sectarian prayer in public forums – is to surrender the essence of the
Establishment Clause and allow government to throw its weight behind a particular faith. *Marsh*
did not countenance any such idea."). Here, the Court is not engaging in the sort of parsing that
the *Marsh* Court cautioned against but, rather, is examining The Lord's Prayer as a whole to
assess whether it advances one particular faith.

*Woodbine Cmty. Sch. Dist.*, 204 F. Supp. 2d 1195, 1197 (S.D. Iowa 2002) (citing expert

testimony to support conclusion that "the words of 'The Lord's Prayer' and its ritual unison

recitation or singing are central to the Christian faith and liturgy"); *Johns v. Allen*, 231 F. Supp.

852, 857 n.7 (D. Del. 1964) (opining presentation of The Lord's Prayer in public schools

"serve[s] to prefer one religion, i.e., the Christian religion, over any other," for "The Lord's

Prayer is contained in the New Testament of the King James version of the Bible"). *But see*

*Doremus v. Board of Ed. of Borough of Hawthorne*, 75 A.2d 880, 888 (N.J. 1950) ("We find

nothing in the Lord's Prayer that is controversial, ritualistic or dogmatic. It is a prayer to 'God,

our Father'. It does not contain Christ's name and makes no reference to Him."). Scholarly

authorities agree that The Lord's Prayer is distinctly Christian.[15]

    Although Defendants' two experts, Dr. John Dominic Crossan and Dr. James Edward

Jones, opine that The Lord's Prayer does not have exclusively Christian content (*see* D.I. 41, Ex.

A ¶¶ 20, 31 & Ex. B ¶ 25), it is likely that the Court will ultimately find The Lord's Prayer to be

a Christian prayer. The Court recognizes that specific words within The Lord's Prayer are not

solely associated with the Christian faith.[16] Still, viewing The Lord's Prayer as a whole, it

---

[15]*See, e.g.*, D.I. 12 at 8-9 (citing sources); C.J. CONNER, JESUS AND THE CULTURE WARS: RECLAIMING THE LORD'S PRAYER 13 (2007); *see also* KENNETH STEVENSON, THE LORD'S PRAYER: A TEXT IN TRADITION 2 (2004) ("[T]he 'Lord's Prayer' is the central prayer of the Christian faith."); Daniel O. Conkle, *The Establishment Clause & Religious Expression in Governmental Settings: Four Variables in Search of a Standard*, 110 W. VA. L. REV. 315, 326 (2007) (noting The Lord's Prayer is "distinctly sectarian in nature"); Robert J. Delahunty, *"Varied Carols": Legislative Prayer in a Pluralist Society*, 40 CREIGHTON L. REV. 517, 527 (2007) (stating "Christian Lord's Prayer" has been found to contain "'sectarian' associations"); Anthony Barone Kolenc, *"Mr. Scalia's Neighborhood": A Home for Minority Religions?*, 81 ST. JOHN'S L. REV. 819, 874 (2007) ("The Lord's Prayer [is] undoubtedly sectarian . . . .").

[16]As already noted, *see supra* n.2, it is undisputed that "The Lord" of the title of "The Lord's Prayer" is Jesus Christ. (*See* D.I. 41, Ex. A ¶¶ 15, 22) However, it does not appear from

20

appears to be a distinctly Christian prayer. Defendants' expert Dr. Crossan even admits that, as used in religious observances, The Lord's Prayer is specifically Christian.[17] (D.I. 41, Ex. A ¶ 31) Defense counsel stated that it is undisputed that The Lord's Prayer comes from the New Testament. (Tr. at 27) Defense counsel further stated at oral argument that Defendants did not dispute that today only Christians say The Lord's Prayer as part of their religious observances. (*Id.* at 27-28)

Moreover, the Court determines that it is likely to conclude that the Council's practice of opening each meeting with a recitation of this distinctly Christian Lord's Prayer violates the Establishment Clause because it constitutes government endorsement of the Christian faith. The fact that The Lord's Prayer has been the *only* prayer recited at the beginning of Council meetings for over six years is likely to be found to demonstrate that the Council gives Christianity an unconstitutionally preferred status, sending a message to meeting attendees that the Council is promoting the beliefs of Christianity.[18] *See generally Bacus*, 52 Fed. Appx. at 357 (opining that recitation of distinctively Christian prayer was unconstitutional because it "advanced one faith,

---

the record that the title is recited at Council meetings. The Court's conclusion that it will likely find The Lord's Prayer to be sectarian does not turn on the title or whether the title is said aloud.

[17]Plaintiffs' expert, David Harrington Watt, declares: "asserting that [T]he Lord's Prayer is not a Christian prayer is a great deal like asserting that water is not wet." (D.I. 21 at 7)

[18]In cases where delivery of sectarian prayer has been upheld, Courts have relied on the diversity of the prayers delivered. *See, e.g., Pelphrey*, 547 F.3d at 1267 (finding "diversity of the religious expressions . . . supports the finding that the prayers, taken as a whole, did not advance any particular faith"); *Newdow v. Bush*, 355 F. Supp. 2d 265, 289 (D.D.C. 2005) (opining that plaintiff was "not likely to succeed on his claim under *Marsh* on the basis of the sectarian nature of the inaugural prayers standing alone" because inaugural prayers frequently represented different denominations, which demonstrated that government was not "'exploiting' the prayer opportunity to 'proselytize' a particular faith or creed").

Christianity, providing it with a special endorsed and privileged status"); *Stein*, 822 F.2d at 1410

(stating delivery of sectarian prayer "symbolically place[s] the government's seal of approval on

one religious view"). Contrary to Defendants' assertion (D.I. 14 at 3), advancement of religion is

distinct from proselytization. As the Fourth Circuit has summarized:

> Proselytize and advance have difference meanings and denoted
> different activities. To proselytize . . . means to seek to convert
> others to [a] belief, whereas to advance . . . means simply to
> forward, further, or promote [a] belief. Advancement *could*
> include conversion but it does not necessarily contain any
> conversion or proselytization element. Similarly, although
> proselytization certainly involves some element of advancement,
> the word proselytize stresses conversion in a manner that the word
> advance does not.

*Wynne*, 376 F.3d at 300 (emphasis in original) (internal quotation marks and citations omitted).

Therefore, Plaintiffs need not show proselytization in order to prove advancement. The

Council's advancement of Christianity likely violates the principle that "citizens should come to

public meetings confident in the assurance that government plays no favorites in matters of faith

but welcomes the participation of all." *Joyner*, 653 F.3d at 355.

By demonstrating a likelihood of success on their claims under the United States

Constitution, Plaintiffs have also demonstrated that they are likely to succeed on the merits of

their claims under the Delaware Constitution. *See Cape Henlopen Sch. Dist.*, 759 F. Supp. 2d at

528.

## B. Likelihood of Irreparable Harm to Plaintiffs

Plaintiffs have demonstrated that they will suffer irreparable harm if injunctive relief is

denied. "'The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury.'" *Indian River Sch. Dist.*, 653 F.3d at 283 n.14

22

(quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As the D.C. Circuit has concluded: "[W]here a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary injunction determination." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006); *see also Hinrichs*, 440 F.3d at 403; *ACLU of Ky.*, 354 F.3d at 445. Plaintiffs have demonstrated that they will suffer irreparable harm unless relief is granted because Plaintiffs plan to attend future Council meetings (*see* D.I. 1 ¶¶ 7-10) and will be forced to hear Council's likely unconstitutional recitation of The Lord's Prayer at future meetings.

## C. Lack of Irreparable Harm to Defendants

Defendants will not suffer irreparable harm if the Court grants a preliminary injunction. Defendants contend that they may suffer harm if the Court grants an injunction because Council members will no longer receive the guidance in performance of their duties that they now receive by reciting The Lord's Prayer. (Tr. at 42-43) However, prohibiting the Council from reciting The Lord's Prayer does not prevent the Council from opening its meetings with a nonsectarian prayer or moment of silence, which could also enable the Council members to seek guidance (without offending the United States or Delaware Constitution).

## D. Public Interest

Plaintiffs have demonstrated that the public interest favors granting a preliminary injunction. "[W]here there are no societal benefits justifying a burden on religious freedom, the public interest clearly favors the protection of constitutional rights." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) (internal quotation marks omitted). Here, the public interest favors an environment in which there is not any governmental favoritism of a

23

specific religion in violation of the Establishment Clause. Defendants argue that a preliminary injunction is not in the public interest because Plaintiffs are not likely to succeed on the merits of their claims. (*See* D.I. 27 at 18-20) However, in light of the Court's determination that Plaintiffs have demonstrated a likelihood of success on the merits, Defendants' argument is unpersuasive. Accordingly, the public interest favors granting a preliminary injunction.

### E.     **Waiver of Bond Requirement**

Under Federal Rule of Civil Procedure 65(c), a court generally may not issue a preliminary injunction unless the party seeking the injunction provides a security bond, as the rule on its face admits no exceptions. *See* Fed. R. Civ. P. 65(c); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210 (3d Cir. 1990). There are situations, however, in which the bond requirement can be waived. *See Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991).

The Third Circuit has articulated factors for assessing whether a Court should waive the bond requirement. "First, at least in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." *Id.* at 219. Here, the loss to the enjoined parties is non-monetary. Also, Plaintiffs are citizens who are of modest income; forcing them to post a bond could create a financial hardship.

Second, the Court should consider "the impact that a bond requirement would have on enforcement of such a [federal] right, in order to prevent undue restriction of it." *Id.* at 220. Here, this lawsuit seeks to enforce the federal right to be free from unconstitutional government establishment of religion.

Defendants are not requesting a bond in this case, and based on the factors discussed

24

above, the Court determines that waiver of the bond requirement is appropriate. (Tr. at 46) Accordingly, Plaintiffs will not be required to post a bond.

## V. *Sua Sponte* Stay of Preliminary Injunction

As is evident from the preceding discussion, courts across the country have grappled with determining the constitutionality of legislative prayers. In many instances, the invocations offered at the start of legislative sessions have been found to be nonsectarian and entirely constitutional. This has been true of nonsectarian prayers offered by government officials, *see, e.g., Turner*, 534 F.3d at 353, 356, and those offered by community religious leaders, *see, e.g., Marsh*, 463 U.S. at 793-95 (permitting nonsectarian invocation delivered by Presbyterian minister); *Simpson*, 404 F.3d at 279 (permitting nonsectarian invocations delivered by various community religious leaders). Courts also have upheld a legislative body's practice of inviting community religious leaders to deliver prayers of any type – including sectarian prayers.[19] *See, e.g., Pelphrey*, 547 F.3d at 1266 (upholding constitutionality of two county commissions' practices of "allow[ing] volunteer leaders of different religions, on a rotating basis, to offer invocations with a variety of religious expressions"); *Atheists of Fla., Inc., v. City of Lakeland*, ___ F. Supp. 2d ___, 2012 WL 589588, at *13 (M.D. Fla. Feb. 22, 2012) (holding that town council's practice of inviting community religious leaders listed in phone book to deliver opening invocations, including sectarian invocations, was constitutionally permissible); *Galloway v. Town of Greece*, 732 F. Supp. 2d 195, 218 (W.D.N.Y. 2010) (determining town council's practice of inviting community religious leaders whose names appear on lists published by town

---

[19]In situations where courts have upheld a government body's practice of inviting community religious leaders to deliver invocations, there was no evidence of any impermissible motive in choosing which religious leaders to invite.

chamber of commerce and local newspaper to deliver opening invocations, including sectarian invocations, was constitutionally permissible).

In short, "public institutions throughout this country manage to regularly commence proceedings with invocations that provide all of the salutary benefits of legislative prayer without the divisive drawbacks of" a constitutional violation. *Joyner*, 653 F.3d at 354. As Justice O'Connor has summarized, legislative prayers that withstand constitutional scrutiny "share a common characteristic: they recognize[ ] the rich religious heritage of our country in a fashion that [is] designed to include members of the community, rather than to proselytize." *Turner*, 534 F.3d at 356.

Under the circumstances, the Court deems it appropriate to stay the effect of its preliminary injunction order for a period of one month. It is hoped that during this period the parties may confer – perhaps with the assistance of one of this Court's judicial officers as mediator – and attempt to agree upon how to preserve the Council's practice of opening its meetings with a prayer but to do so in a manner that is consistent with the United States and Delaware Constitutions.

## CONCLUSION

The Court will deny Defendants' Motion to Dismiss. The Court will grant Plaintiffs' Motion for Preliminary Injunction, but will stay entry of the preliminary injunction for thirty days. An appropriate Order follows.